IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ZACHARY T. PAINTER

Plaintiff,

vs.                                                    No. 1:07-cv-0395 MCA/ACT

WELLS FARGO BANK, N.A., et al.

Defendants.

MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on (1) *Plaintiff Zachary T. Painter's Motion
for Summary Judgment as to Counts I, II, V, and VI and Supporting Memorandum* [Doc. 64],
filed July 11, 2008, and (2) *City Defendants' Motion for Summary Judgment* [Doc. 69], filed
August 22, 2008.   Having considered the parties' submissions, the relevant law, and
otherwise being fully advised in the premises, the Court concludes that the Motions should
be **GRANTED in part and DENIED in part.**

I.      BACKGROUND

On March 21, 2007, Plaintiff Zachary Painter filed this civil action in state court
against the City of Albuquerque and four of its police officers, and against Wells Fargo
Bank, N.A. and one of its employees, Melanie Garcia.  Mr. Painter sought damages for
various Fourth Amendment violations and state law torts.  These allegations arise from an
incident that occurred on the afternoon of August 1, 2006, when the police officer
Defendants went to Wells Fargo Bank in response to a *911* call from Defendant employee

Melanie Garcia that Mr. Painter was attempting to cash a fraudulent check.  Plaintiff alleges that upon arriving at the bank, the Defendants proceeded to unlawfully arrest him, use excessive force, and later, to maliciously prosecute him for a crime of which he was not guilty.  Defendants removed the case to federal court on April 24, 2007.  The Court subsequently dismissed several of the claims against Wells Fargo Bank and Ms. Garcia. [Doc. 42.]  The remaining claims against these two Defendants were dismissed pursuant to stipulation of the parties.  [Docs. 56, 57.]  Only the City of Albuquerque and police officers remain as Defendants.

Plaintiff and these remaining Defendants have filed cross-motions for summary judgment.  The evidence of record and undisputed facts submitted with the parties' motion papers can be summarized as follows.

In this case, what began as a routine visit to a bank by one of its customers in order to verify the sufficiency of funds in a check which he received upon the sale of his vehicle, ended with the arrest and incarceration of that customer for conducting himself in a manner that any well-intended citizen and bank customer might undertake under similar circumstances.  Upon tendering the check, Bank employees, and subsequently City police officers, mistakenly assumed that Plaintiff was the perpetrator of a scam, rather than its victim.  As a result of the treatment perpetrated upon him at the Bank by City police officers, Mr. Painter's Constitutional rights were violated for a brief period, as more fully described below.

2

The facts giving rise to this lawsuit began when Mr. Painter, who was 23 years old at the time, arrived at a Wells Fargo Bank in Albuquerque, New Mexico at approximately 3:00 p.m. on August 1, 2006. [Doc. 64-2 at 30.] Upon his arrival, Mr. Painter signed-in to meet with a customer service representative and, after waiting a short time for his name to be called, met with bank employee Melanie Garcia. [Doc. 64-2 at 30.] He handed the cashier's check to Ms. Garcia and explained that he had obtained it from someone who wanted to buy his car. [Id.] He asked her whether there were funds available to pay the check. [Id.] Mr. Painter did not endorse the check. [Doc. 9-2 at 4; Doc. 64-9 at 8.] Ms. Garcia told Mr. Painter that she would have to consult with her manager. She left her office taking the check with her. [Doc. 64-3 at 8.] Several minutes later, Ms. Garcia returned and asked for Mr. Painter's identification, which he provided. [Doc. 64-2 at 31.]

While Mr. Painter waited, Ms. Garcia consulted with her supervisor, Kim Yake. [Doc. 64-3 at 8.] Together, they called a check verification service and learned that the cashier's check had been had been paid over one year earlier. [Doc. 64-3 at 8.] They concluded that the check was fraudulent.[1] [Doc. 64-3 at 8.] Ms. Yake instructed Ms. Garcia to call the police. [Doc. 64-3 at 8.] Ms. Garcia dialed *911* and reported that a customer was in the bank "trying to cash a fraudulent check that was cashed over a year ago...a $36,000 cashiers check." [Doc. 9-2 at 6; Doc. 64-3 at 8; Pl.'s Ex. 8.] Ms. Garcia gave the *911* operator Mr. Painter's name and physical description. [Pl.'s Ex. 8.] The *911* operator

---

[1]Defendants claim there were other indications that the check was fraudulent, including that the print was discolored and that it was signed by only one maker though it appeared to require two signatures. [Doc. 70-2 at 8.]

advised Ms. Garcia that officers had been dispatched.  [Id.]

Defendant Officer Bradley Perry and Officer Mannarino[2] were driving by the bank when they overheard the dispatch officer report that a felony was in progress and that a person at the Wells Fargo Bank had attempted to negotiate a fraudulent check.  [Doc. 64-7 at 3, 4.]  Though they were not the primary officers dispatched, they were the first to arrive at the scene because of their proximity to the bank.  [Id. at 5.]  They arrived at around 3:40 p.m.  [Doc. 64-6 at 5; Doc. 64-7 at 9, 10.]  Ms. Garcia, who was still on the telephone with the *911* operator when they arrived, informed the operator that Mr. Painter was leaving the bank.  [Doc. 64-9 at 8; Pl.'s Ex. 8.]  The operator, in turn, relayed Mr. Painter's description to officers in the field and advised that the subject of the call was exiting the building.  [Pl.'s Ex. 9.]  Mr. Painter contends he was stepping outside intending to smoke a cigarette and call his mother.  [Doc. 64-2 at 31.]

Officer Perry observed Mr. Painter exiting the building and determined that he matched the description of the suspect.  [Doc. 64-7 at 4.]  He stopped Mr. Painter as he was exiting the bank and asked his name.  [Id.]  Mr. Painter identified himself.  [Id.]  As Mr. Painter moved outside, Officer Perry ordered him to turn around and put his hands over his head.  [Id.]  Officer Perry then patted down Mr. Painter and handcuffed him.  [Id.]  Mr. Painter was compliant and cooperative, and did not resist.  [Doc. 64-4 at 5; Doc. 64-7 at 6.]

While Officer Perry was patting down and handcuffing Mr. Painter, Defendant Officer

---

[2]Officer Perry had graduated from the policy academy approximately one month earlier and was still in training.  Officer Mannarino was training Officer Perry.  [Doc. 64-7 at 3.]  Officer Mannarino is not a defendant in this case.

4

Charles Crook and Officer Romero arrived, followed by Defendant Officer John Kelly and

Defendant Officer Dwight Porlas.[3]  [Doc. 64-4 at 6; Doc. 64-5 at 2; Doc. 64-7 at 5; Doc. 64-8

at 9–10.]  Officer Kelly, who was the primary and ultimately, the arresting officer, went

inside the bank to interview Ms. Garcia and Ms. Yake.[4]  [Doc. 64-8 at 8.]  Ms. Garcia told

him that Mr. Painter had signed in for customer service and that she had walked him to her

desk and asked how she could help him.  [Doc. 64-3 at 20; Doc. 64-8 at 7.]  Ms. Garcia

further told Officer Kelly that Mr. Painter said he had "sold his car and wanted to cash this

check, or get cash back today and how much he would be able to get in cash or how soon

would the funds be available."  [Doc. 64-8 at 7, 11–12.]  Ms. Garcia also told Officer Kelly

that her manager, Ms. Yake, verified three times with Integrated Payment Systems, Inc. that

the check in question was fraudulent and had been cashed over one year ago.  [Doc. 64-3 at

20; Doc. 64-8 at 7.]  She stated that Mr. Painter waited in her office while she called to verify

the check, and that he provided his driver's license upon request.  [Doc. 64-3 at 20.]

Officer Kelly and the other Defendants obtained and examined the fraudulent check,

the envelope that had carried the check, and Mr. Painter's driver's license.  [Doc. 64-8 at 11.]

They checked the records of the Motor Vehicle Division and determined that Mr. Painter's

driver's license was valid.  [Doc. 64-5 at 8, 9.]  They checked for outstanding warrants and

---

[3]Defendants Crooke and Kelly, like Officer Perry, had graduated from the policy academy approximately one month earlier and were still in training.  [Doc. 64-4 at 3; Doc. 64-8 at 3.]  Officer Romero, who is not a defendant in this case, was training Officer Crooke. [Doc. 64-3 at 3.]  Officer Porlas was training Officer Kelly. [Doc. 64-8 at 4.]

[4]The record indicates that another officer, Vic Tafoya was already inside the bank making contact with bank employees when Officer Kelly arrived and took over the investigation.  [Doc. 64-8 at 9.]

determined that Mr. Painter had none. [Doc. 64-5 at 8, 9, 13.]

After interviewing Ms. Garcia and Ms. Yake for ten or fifteen minutes, Officer Kelly went to question Mr. Painter where he was being held in handcuffs outside the bank. [Doc. 64-5 at 7; Doc. 64-8 at 7.] Mr. Painter stated that he was selling his car over the internet. [Doc. 64-8 at 7, 11.] He explained that he had been contacted by a potential buyer in Canada, that they had exchanged emails, and that the potential buyer had agreed to send Mr. Painter a cashier's check for $36,000. [Doc. 64-8 at 7, 11.] He further explained that although the price of the vehicle was $28,000, the additional $8,000 was for shipping and other costs, that he was instructed to remit to the supposed buyer. [Doc. 64-8 at 7, 11.]

Mr. Painter was unable to give Officer Kelly the name of the buyer or the details of the account to which he was instructed to send the $8,000. [Doc. 64-8 at 11.] However, he offered to take the officers to his home a half mile away and show them the emails and other documents which would confirm his version of how the transaction came to be. [Doc. 64-8 at 12.] The officers declined his offer and instead placed Mr. Painter under arrest for second degree felony fraud. [Doc. 64-8 at 12.] At some point thereafter, Officer Crooke escorted Mr. Painter to a patrol car and advised him of his *Miranda* rights. [Doc. 64-4 at 4.] It is undisputed that Mr. Painter was cooperative and polite to the officers, and at no time did he resist. [Doc. 64-5 at 8; Doc. 64-9 at 4.]

Officers Crook, Kelly, and Porlas took Mr. Painter to a police substation where he was handcuffed to a pole. [Doc. 64-9 at 4–5.] Approximately 40 minutes had elapsed between the time Mr. Painter first encountered the officers at the bank and the time he arrived at the

6

substation.  [Doc. 9-2 at 9.]  Later that day, Officers Kelly and Porlas transported Mr. Painter via police cruiser to the Metropolitan Detention Center.  [Doc. 64-9 at 5.]  There, he was "processed" and placed in a holding cell.  [Doc. 64-2 at 32–33.]  He was eventually able to telephone his mother and alert her that he had been arrested.  [Doc. 64-2 at 33.]

Some time early the next morning, Mr. Painter was released on his own recognizance. [Doc. 64-2 at 35, 36.]  He was placed on a bus with other detainees and released in downtown Albuquerque at approximately 3:30a.m. or 4:00 a.m.  [Doc. 64-2 at 36.]  While he was on the bus, he was harassed by the other detainees who grabbed and used his cell phone.  [Doc. 64-2 at 36.]  Upon being released from the bus, he ran from them and briefly hid until he was able to call his girlfriend to pick him up.  [Doc. 64-2 at 36.]

In the motion papers he submitted after filing this lawsuit, Plaintiff contends that had the officers further investigated the matter instead of taking him directly to the police station in the manner described above, they would have discovered the following facts.  Mr. Painter owned a Mustang convertible automobile that he had decided to sell.  [Doc. 64-2 at 2, 39.] In June 2006, he advertised it for sale on Autotrader.com, an internet site, for $28,000.  [Id. at 2, 8.]  On July 11, 2006, he received a notification from Autotrader.com that an individual identifying herself as Catherine Heener was interested in buying the Mustang.  [Id. at 2, 13.] Mr. Painter and Ms. Heener exchanged emails about the automobile, and on July 20, 2006, Ms. Heener sent Mr. Painter an email stating that she wished to buy the car for a client.  [Id. at 2–3, 14.]  She promised to send Mr. Painter a cashier's check for $36,000, explaining that the additional $8,000 should be remitted to the alleged buyer to offset shipping, taxes, and

7

repair costs.  [Id. at 14.]  For the next week, they continued to exchange emails regarding the completion of the transaction.  [Id. at 16–20.]

On August 1, 2006, at around 2:30 p.m., Mr. Painter received an envelope in the mail containing the promised cashier's check.  [Doc. 9-2 at 3.]  The check was made out in the amount of  $36,000.82 and was payable to Mr. Painter.  [Doc. 64-3 at 10.]  The circumstances surrounding the transaction, including the large amount reflected on the check, aroused Mr. Painter's concern.  [Doc. 64-2 at 29.]  He decided to consult with his mother and seek her advice as to how to proceed.  [Doc. 64-2 at 29.]  She advised him not to endorse the check or sign anything until he verified that the check was valid.  [Doc. 64-2 at 29, 31.]  She further advised him to take the check to Wells Fargo Bank, where he maintained a account, and to speak with an associate at the bank.  Specifically, she advised him to ask to have the check verified so as to determine if funds were available.  [Doc. 64-2 at 29.] Mr. Painter then drove directly to his bank, with the full intent of heeding his mother's  advice.  [Doc. 64-2 at 29.]

Had the bank employees and police officers given him the chance to explain these facts, Mr. Painter contends that his arrest and subsequent detention could have been avoided.

II.   **ANALYSIS**

A.   **Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure permits a party seeking to recover upon a claim to move for summary judgment in the party's favor.  Fed.R.Civ.P. 56(a). When the movant is the party bearing the burden of persuasion at trial, he must show that the record

as a whole satisfies each essential element of his claim in such a way that no rational trier of fact could find for the non-moving party.  See 19 Solid Waste Dep't Mechs. v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir.1998).  Rule 56(b) also permits a defendant to move for summary judgment.  See Fed. R. Civ. P. 56(b).

Summary judgment "should be rendered if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e)(2).  Rather, the opposing party's response must "set out specific facts showing a genuine issue for trial." Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  Celotex, 477 U.S. at 324.  It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and

9

draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551–52 (1999).

Persons sued in their individual capacity under 42 U.S.C. section 1983 generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violated established law even in novel factual circumstances," Hope vs. Pelzer, 536 U.S. 730, 741, 745 (2002);.  The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741; accord Roska vs. Peterson, 328 F3d 1230, 1247-48 (10th Cir. 2003).

When, as here, a defense of qualified immunity has been raised in the context of the Fourth Amendment, the Court applied two distinct standards of reasonableness.  First, in determining whether a defendant's actions violated a specific right, the Court must decide whether the defendant conducted a search or seizure that was "unreasonable" under the Fourth Amendment.  Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the search, or seizure, the

Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier v. Katz, 533 U.S. 194, 203-04 (2001), overruled in part by Pearson v. Callahan, __ U.S. ___, 129 S. Ct. 808 (2009).[5]

The subjective intentions or state of mind of the Plaintiff or the Defendants are not relevant to determining whether the entry and search of a residence is objectively reasonable under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001; United states vs. Sanchez, 89 F3d 715, 718 (10th Cir. 1996).  Rather, the "reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split -second judgments' under stressful and dangerous conditions."  Medina, 252 F.3d at 1131 (quoting Graham, 490 U.S. at 396-97).

This assessment must be "based upon the information the officers had when the conduct occurred."  Saucier, 533 U.S. at 207.  Thus, while Plaintiff cannot rely on information that was unknown to the Defendants as a basis for establishing a Fourth Amendment violation, by the same token the Defendants cannot rely on evidence first discovered *after* a search occurred to show the reasonableness of the search which preceded theat discovery.  See United vs. Reeves, 524F3d 1161, 1170 (10th Cir. 2008).

---

[5]The Court notes that after Pearson, it is no longer mandatory to conduct the first step in the qualified immunity analysis before proceeding to the second step.

### B.  **Plaintiff's Claims of Unlawful Detention and Arrest**

The events at issue here unfolded in two discrete stages.  The first stage, to which the Court will refer as the "Initial Encounter," occurred when Officer Perry and his training officer arrived at the scene, encountered Mr. Painter at the entrance of the bank, identified him as the suspect, patted him down, and handcuffed him.  The second stage, to which the Court will refer as the "Formal Arrest," occurred when the remaining officers, most notably Officers Kelly and Porlas, arrived and interviewed the witnesses at the scene, and then formally placed Mr. Painter under arrest.  For the reasons set forth below, the Court concludes as a matter of law that the Initial Encounter became an unlawful detention when Officer Perry handcuffed Plaintiff.  This unlawful detention ended a brief time later, however, when the other officers finished interviewing witnesses at the scene and began the Formal Arrest.  At the Formal Arrest stage, the officers had probable cause to justify the continued detention and arrest of Plaintiff from that point forward.

### 1.  **The Initial Encounter**

The Court is asked to determine, with respect to the Initial Encounter,  whether it constituted an investigative detention or a *de facto* arrest, and if it constituted an arrest, whether it was justified by probable cause.  Because he is the movant, and because Defendants have raised the defense of qualified immunity, Mr. Painter bears the burden with respect to these matters.

### a.  **Was there a violation of a Constitutional right?**

In Count I, as it relates to the Initial Encounter, Mr. Painter asserts that the "defendant

12

police officers deprived him of his Fourth Amendment right to be free from unreasonable seizures when, with no reasonable belief that [he] had committed a crime, they grabbed, handcuffed, and arrested [him]."  [Doc. 4-2 at 43.]  He contends that he is entitled to summary judgment on Count I because Officer Perry arrested him without conducting an adequate investigation and without probable cause to believe he had committed a crime. [Doc. 64 at 15.]  According to Mr. Painter, in ordering him to turn around and place his hands over his head, and then handcuffing him, the officers exceeded the scope of an investigative detention—or "Terry stop"—and effected a *de facto* arrest.  Mr. Painter further argues that the arrest was without probable cause and "unreasonable because Officer Perry made it before the police had done any investigation to determine whether a crime occurred." [Id. 64 at 15–18.]  Defendants contend that information from bank employees Garcia and Yake  that Mr. Painter was attempting to negotiate a fraudulent check provided legally sufficient reasonable suspicion to detain Mr. Painter and legally sufficient probable cause to arrest him.  [Doc. 70 at 6.]  They further argue that at a minimum, the trustworthiness of the information is a question of fact that precludes summary judgment for Mr. Painter.  [Id.] Defendants assert the defense of qualified immunity.  [Id. at 5–6.]

### i.      Arrest or *Terry* Stop

The constitutional right at issue here is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  For purposes of analyzing Fourth Amendment issues, the Tenth Circuit has divided interactions between police and citizens into three categories:  consensual

encounters, investigative stops, and arrests.  Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer simply approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and end the encounter.  Such encounters "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver, 209 F.3d at 1186.

At the other end of the spectrum are arrests, which are "characterized by highly intrusive or lengthy search or detention."  Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  Warrantless arrests must be supported by "probable cause to believe a crime has been committed by the arrestee."  Oliver, 209 F.3d at 1186.  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  Oliver, 209 F.3d at 1186 (quoting Romero v. Fay, 45 F.3d 11472, 1476 (10th Cir. 1995)).

An investigative detention—also referred to as a Terry stop—occurs when an officer stops and briefly detains an individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Though an investigative detention need not be supported by probable cause to be lawful, the officer must have "reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause."  Oliver, 209 F.3d at 1186 (citations and quotation marks

omitted).

Defendants appear to assert that Officer Perry simply briefly detained Mr. Painter.[6] However, they also contend that Officer Perry had probable cause to arrest Mr. Painter upon arriving at the bank and observing  a man who matched the description of the suspect walk out of the bank.  [Doc. 70 at 8.]

In addressing the constitutionality of a detention, the Court undertakes a twofold inquiry.  First, the officer's action must be "justified at its inception."  United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002) (citations and quotation marks omitted).  Second, the officer's action must be "reasonably related in scope to the circumstances which justified the interference in the first place."  Neff, 300 F.3d at 1220 (citations and quotation marks omitted).  "If a police-citizen encounter exceeds the limits of Terry stop, the detention becomes an arrest and must be supported by probable cause."  Neff, 300 F.3d at 1220 (citation omitted).

Mr. Painter argues that in ordering him to turn around and put his hands behind his head, and then handcuffing him, Officer Perry effected an arrest, rather than an investigative detention.  According to Mr. Painter, these "restrictions on his personal security were unreasonable and constituted an arrest under the Fourth Amendment because Officer Perry had no reason to believe that Mr. Painter was armed and dangerous or any threat to officer

---

[6]The officers apparently believed that Mr. Painter was not, at least as of the time of the Initial Encounter, under arrest, but that he had merely been placed in investigative detention. The officers' subjective beliefs are irrelevant.  Cortez v. McCauley, 478 F.3d 1108, 1116 n.7 (10th Cir. 2007) (en banc).

15

safety."  [Doc. 64 at 15.]

It is undisputed that Officer Perry and his training officer were the first officers to arrive at the bank, and that Officer Perry patted down Mr. Painter and handcuffed him as soon Mr. Painter identified himself.  It also is undisputed that, other than asking Mr. Painter to identify himself, they performed no investigation prior to the pat down and handcuffing. The only information that Officer Perry had when he patted down and handcuffed Mr. Painter was his physical description and information provided by the dispatcher that Mr. Painter "was trying to cash a check that had been cashed approximately a year ago."  [Doc. 70-4 at 3.]

The Court concludes that the officers were justified in stopping Mr. Painter.  A *911* call from a bank employee provided sufficient detail regarding a purported attempt to cash a fraudulent check for a substantial sum.  The caller identified herself, provided the suspect's name and description, and indicated that she had the suspect's drivers license.  Upon arriving at the scene, the officers encountered a person matching the description who identified himself by name.  The officers had reasonable suspicion, based on the report provided by dispatch, that criminal activity was afoot.  The Court therefore turns to the second prong of the Terry inquiry: the scope of the detention.

"The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest."  Cortez v. McCauley, 478 F.3d 1108, 1115–16 (10th Cir. 2007) (en banc) (citation, brackets, and quotation marks omitted).  Nonetheless, the use of handcuffs alone does not necessarily indicate that an arrest

16

has been effected.  Officers are allowed to use handcuffs during an investigative detention if there is a reasonable, articulable belief that the suspect poses a danger to the officers.  Neff, 300 F.3d at 1221.

Here, it is undisputed that there was no information conveyed to the officers that Mr. Painter was armed or dangerous in any way.  The information that was conveyed to the officers was that a nonviolent potential felony was in progress.  Furthermore, upon the initial encounter with Officer Perry, Mr. Painter was cooperative, compliant, and did not attempt to flee.[7]  Officer Perry testified that Mr. Painter was carrying a cell phone which he placed on the ground, and that he frisked Mr. Painter and found no weapons or contraband of any kind.  [Doc. 64-2 at 4.]  In short, there was no indication that Mr. Painter posed a danger to officers or that he would attempt to flee.  The only basis Defendants articulated for handcuffing Mr. Painter is that he was suspected of committing a felony.  The Court concludes that under the circumstances of this case, the handcuffing of Mr. Painter without a reasonable, articulable belief by the officer that he posed a danger to officers, exceeded the scope of an investigative detention and constituted an arrest.

Defendants cite to the authority of  United States v. Shareef, 100 F.3d 1491 (10th Cir. 1996), in support of the officer's right to handcuff Mr. Painter.  There, the encounter, which was a traffic stop, began with two officers confronting six suspects at 3:30 a.m., one of whom matched the description of a wanted armed and dangerous felon.  Shareef, 100 F.3d at 1505.

---

[7] There is no evidence that Mr. Painter was going back into the bank when he was first spotted by the officers, as Defendants contend at one point in their brief.  [Doc. 70 at 8.]  The only evidence is that Mr. Painter encountered Officer Perry as he was exiting the bank, or immediately outside the bank.

Our Tenth Circuit held that the officers were entitled to display their weapons, separate the defendants from their vehicles, conduct a pat down search, and restrain the defendants with handcuffs until all six had been secured, without exceeding the scope of a Terry stop. Shareef, 100 F.3d at 1506.  The Tenth Circuit was troubled, however, by the continuing use of force after additional officers arrived at the scene and it was determined that the defendants were unarmed.  Nevertheless, the Tenth Circuit held that the "number of suspects, the fact that the encounter took place at night, and the reasonable suspicion that one of the suspects was a wanted felon, justified the officers in keeping the defendants in handcuffs for the officers' safety."  Shareef, 100 F.3d at 1507 (finding it a "close question").

By contrast, Mr. Painter was alone.   He was outnumbered by law enforcement officers, two to one at a minimum.   The encounter occurred during the daytime, and the police had no information that he was armed, dangerous, or wanted by authorities.  The present situation is by no means analogous to the facts of Shareef.

Having concluded that the initial encounter with the officers constituted an arrest, I next consider whether it was supported by probable cause.

### ii.	Whether Officer Perry had probable cause to arrest Mr. Painter at the time the officer first identified him

In evaluating whether the events leading up to this *de facto* arrest amount to probable cause, the Court inquires as to whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause.  Cortez, 478 F.3d at 1116.  "Probable cause is based on the totality of the circumstances, and requires reasonably

trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." Cortez, 478 F.3d at 1116.

The Court concludes that although the *911* call and report from dispatch provided reasonable suspicion to detain Mr. Painter for further questioning and investigation, it did not provide probable cause to arrest him.  Probable cause requires more than mere suspicion. United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004).  A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime. See Beck v. Ohio, 379 U.S. 89 (1964).   Information about criminal activity provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated.  Alabama v. White, 496 U.S. 325, 328–31 (1990). However, even where a report is considered presumptively reliable, an officer typically must undertake some investigation into the basis of a witness's report before they can lawfully arrest a suspect.  Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994) (collecting cases).  Such was not done in the present case.

Officer Perry conducted no investigation before frisking and handcuffing Mr. Painter. When he effectuated the *de facto* arrest, he had no evidence that a crime had been committed. As far as the record reflects, Mr. Painter was handcuffed solely on the basis of a *911* report of a suspected felony in progress.

Defendants' argument supporting the existence of  probable cause relies on events (including interviews with Bank employees) that occurred *after* Mr. Painter was frisked and handcuffed.  However, whether probable cause exists is determined by the facts known to

19

the officers at the moment the arrest is made; it cannot be established by evidence obtained after the arrest.  <u>Beck</u>, 379 U.S. at 91; <u>United States v. Lacy</u>, 17 Fed.Appx. 745, 750 (10th Cir. 2001). Officer Perry acted prematurely by arresting Mr. Painter essentially immediately upon arriving at the scene and identifying him, before any steps were taken to determine whether a crime had even occurred.[8]  As will be discussed in more detail below, Defendants *subsequently* developed probable cause by questioning witnesses, examining evidence at the scene, and questioning Mr. Painter.

Defendants cite numerous authorities in support of  their proposition that probable cause existed in the circumstances present here.  [Doc. 70 at 8 & n.1.]  These cited cases all concern whether the description of a suspect was sufficient to supply probable cause for an arrest, and they are each distinguishable.  In <u>United States v. Valez</u>, 796 F.2d 24 (2d Cir. 1986), officers arrested Valez based on a description provided by another officer who had observed a suspect selling narcotics on the street.  As it turned out, Valez was not the suspect, but upon arrest was found to be in possession of cocaine.  <u>Valez</u>, 796 F.2d at 25–26.

It was undisputed that police had probable cause to arrest the actual suspect based on their direct observation of criminal activity.  Thus, the only question considered by the Second Circuit was whether the arresting officer reasonably mistook Valez for the suspect. <u>Valez</u>, 796 F.2d at 26.  Applying a line of authorities involving mis-identification, the Second Circuit held that Valez matched the description of the suspect in every detail, and the

---

[8]<u>Dang v. Ehredt</u>, 977 P.2d 29 (Wash. Ct. App. 1999), relied upon by Defendants, which is factually similar to this case in many ways, is distinguishable in one key respect:  In <u>Dang</u>, police did not arrest the plaintiff until after they had performed a reasonable investigation.

description was sufficiently detailed to provide the arresting officer with probable cause to believe that Valez was the suspect.  <u>Valez</u>, 796 F.2d at 27.  Given the totality of the circumstances (active pursuit of suspect who was quickly leaving the area and a lone police officer in a high crime neighborhood) the Second Circuit concluded that the officer's conduct was not unreasonable.  <u>Valez</u>, 796 F.2d at 27.

The most obvious distinction between the present case and <u>Valez</u> is the firsthand knowledge possessed by the police officers that a crime had occurred.  In <u>Valez</u>, before police effectuated the arrest, they had probable cause to believe that a crime had occurred because they observed a drug buy by an undercover officer.  In the present case, officers lacked such specific knowledge and did not develop probable cause until after Mr. Painter was arrested.  Once Mr. Painter was identified and detained, evidencing no intent to flee, and with six officers at the scene, officers had ample time to conduct an investigation.

<u>United States v. Slipka</u>, 735 F.2d 1064 (8th Cir. 1984), cited by Defendants,  also is similarly inapposite.  In <u>Slipka</u>, an FBI agent who had Slipka under surveillance for suspected previous bank robberies, arrested him after receiving information that a suspect matching Slipka's description had just robbed a  bank.  Not only did Slipka match the description in every respect, but he took flight upon making eye contact with the agent.  The Eighth Circuit  found probable cause for an arrest existed under these circumstances.  <u>Slipka</u>, 735 F.2d at 1065–66.

In <u>United States ex rel. Hollman v. Rundle</u>, 461 F.2d 7598 (3rd Cir. 1972), the appellant was arrested because he matched the description of one of two suspects who had

committed a robbery the previous night, and he was in the company of a man closely fitting the description of the second suspect.  United States ex rel. Dessus v. Penn. 452 F.2d 557 (3rd Cir. 1971) is similar.  Although not expressly stated, it is implicit from the opinion and the cases cited therein, that the police were acting upon more than just a description of the suspects and a report of a possible crime.  They had confirmation that three women had been violently assaulted in their home.  Dessus, 452 F.2d at 561–62.

In stark contrast, Officer Perry effectuated the arrest here before speaking to any witnesses or making any attempt to determine whether a crime had occurred.  The Court thus concludes that handcuffing Mr. Painter under the circumstances of this case exceeded the scope of an investigative detention and constituted an arrest.  The Court further concludes that the arrest was without probable cause and thus violated Mr. Painter's Fourth Amendment right to be free from unreasonable seizure.[9]  The Court now turns to consider whether the right was clearly established.

### b.      Was the right clearly established?

The right not to be arrested in the absence of probable cause is undoubtedly clearly-established.  Olsen, 312 F.3d at 1312 (citing Tenn. v. Garner, 471 U.S. 1, 7 (1985)). It also was clearly-established in August 2006, that officers should make a reasonable effort to conduct an investigation and interview witnesses readily available at the scene before invoking the power of warrantless arrest and detention.  Baptiste v. J.C. Penney Co., 147

---

[9]Because the Court concludes there was not probable cause to support the warrantless arrest, the pat-down search incident to the arrest was also improper.  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1256 n. 7 (10th Cir. 1998).

F.3d 1252, 1258–59 (citing Lusby v. T.G.&Y. Stores, Inc., 749 F.2d 143 (10th Cir. 1984), *cert. granted on other grounds sub nom.* City of Lawton, Okla. v. Lusby, 474 U.S. 805 (1985), *aff'd after reconsideration*, 796 F.2d 1307 (10th Cir. 1986)).

The Court thus concludes that the unlawfulness of arresting Mr. Painter based on an uncorroborated *911* call of a nonviolent felony and without first attempting to interview readily available witnesses was apparent in light of clearly established law. A reasonable officer would have understood that his conduct violated Mr. Painter's Fourth Amendment rights.

### c.     Defendants' burden to raise an issue of material fact

Mr. Painter has met his burden. The burden then shifts to Defendants to show that an issue of material fact precludes summary judgment. Defendants, however, have not met their burden. Accordingly, Mr. Painter is entitled to partial summary judgment against Officer Perry on Count I as to his liability with respect to the Initial Encounter. Conversely, summary judgment on Officer Perry's qualified immunity defense must be denied with respect to the Initial Encounter.

### 2.     Formal Arrest

The second aspect of Mr. Painter's Fourth Amendment claims relates to the formal arrest made by Officers Kelly and Porlas. Mr. Painter argues he is entitled to summary judgment on Counts I and II against Officers Kelly and Porlas because they formally placed him under arrest without conducting an adequate investigation and without probable cause to believe that he had committed a crime.

It is undisputed that Mr. Painter was formally placed under arrest after these Defendants had performed some investigation at the scene. The issues regarding this Formal Arrest are whether it was supported by probable cause and whether the investigation performed prior to the Formal Arrest was adequate.

### a.   Whether there was probable cause to arrest Mr. Painter after interviewing witnesses at the scene

The inquiry here is whether the facts and circumstances within Officer Kelly's knowledge and of which he had reasonably trustworthy information were sufficient to lead a prudent person to believe that Mr. Painter had committed or was committing an offense. The Court answers this question in the affirmative, and thus concludes that Officer Kelly had probable cause to arrest Mr. Painter after interviewing witnesses at the scene.

The undisputed facts are that Officer Kelly and his training officer, Officer Porlas, arrived shortly after or around the same time that Officer Perry was handcuffing Mr. Painter.[10]  Officer Kelly entered the bank and interviewed Ms. Garcia and Ms. Yake.  Ms. Garcia told Officer Kelly that Mr. Painter said he had "sold his car and wanted to cash this check, or get cash back today and how much he would be able to get in cash or how soon would the funds be available."  Ms. Garcia also told Officer Kelly that her manager, Ms. Yake, verified three times with Integrated Payment Systems, Inc. that the check in question was fraudulent and had been cashed over one year ago.  Officer Kelly also examined the check and the envelope that it came in.

---

[10]As previously mentioned, Officer Kelly was within his three-month training period and under the supervision of Officer Porlas at the time of these events on August 1, 2006.  [Doc. 64-8 at 4–5.]

After interviewing Ms. Garcia and Ms. Yake for ten or fifteen minutes, Officer Kelly went to question Mr. Painter where he was being detained outside the bank. Mr. Painter stated that he was selling his car over the internet through Autotrader.com. He explained that he had been contacted by a potential buyer in Canada, that they had exchanged emails, and that the potential buyer had agreed to send Mr. Painter a cashier's check for $36,000. Officer Kelly testified that Mr. Painter was unable to provide the email address or account information for the purported buyer of the vehicle. [Doc. 64-8 at 7.] He again spoke to Ms. Garcia and Ms. Yake to "get straight what happened" and, after conferring with Officer Porlas, decided that he had probable cause to arrest Mr. Painter for fraud based on their statements and upon Mr. Painter's inability to provide information. [Id.] As stated by Officer Kelly:

> We determined that we had probable cause to arrest Mr. Painter for the fraud based on the statements of Mr. Garcia and Ms. Yake; Mr. Painter unable to provide any information, basically, on the subject, the actual accounts of the emails and the account numbers, anything like that.

[Id.] At that point, he formally placed Mr. Painter under arrest and transported him to the police substation. [Id.]

Mr. Painter was arrested for felony fraud which in New Mexico consists of consists of "the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations." NMSA 1978, § 30-16-6A. In Mr. Painter's case, the amount was alleged to be in excess of $20,000, which constitutes a second degree felony. Id., §30-16-6F.

The facts outlined above, which the officers developed through interviewing witnesses at the scene, are sufficient to reasonably support an inference that Mr. Painter was in the process of committing a fraud upon the bank by attempting to obtain payment of a fraudulent instrument.  Bank employees had confirmed the fraudulent nature of the check and conveyed that information directly to police during their investigation.  Officers obtained and examined the fraudulent check and the envelope.  They also questioned Mr. Painter and provided him an opportunity to give his side of the story.  Though Mr. Painter had an innocent explanation, he was not able to provide any satisfactory corroboration.

For Fourth Amendment purposes, it does not matter that Mr. Painter was ultimately determined to be innocent of wrongdoing.  The undisputed evidence demonstrates that Officer Kelly based probable cause to arrest Mr. Painter on statements from Ms. Garcia and Ms. Yake.  Mr. Painter's burden requires him to show that these statements did not constitute reasonably trustworthy information.  Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995). He has failed to make such a showing.  Although there is a factual dispute as to precisely what Mr. Painter told Ms. Garcia, summary judgment remains proper.  On the one hand, Mr. Painter alleges he only requested Ms. Garcia to determine the validity of the check.  Officer Kelly, on the other hand, claims that Ms. Garcia said he attempted to cash the check.  This factual dispute does not preclude summary judgment.  Even if the facts are as Mr. Painter alleges, officers could reasonably believe that Mr. Painter was attempting to determine whether the bank would accept the check as valid, as a predicate to obtaining value for it.

The veracity of crime victims, or crime-scene bystanders, ordinarily is assumed in making determinations of reasonable suspicion and probable cause.  See United States v. Blount, 123 F.3d 831, 835 (5th Cir. 1997) (en banc).  Nevertheless, police officers "may weigh the credibility of witnesses" and are not required to believe one witness's testimony over that of another in making such a determination.  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998).  In this case, the officers who conducted the interviews were entitled to rely on the veracity of the bank employees in deciding whether they had probable cause to arrest Plaintiff.

Mr. Painter next argues that the officers were without probable cause to arrest him because there was an absence of evidence on two elements of the offense:  he claims that there was no evidence that he obtained anything of value and no evidence of an intent to deceive.  The Court is not persuaded by these arguments.

The probable-cause standard does "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'"  United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams, 407 U.S. at 148-49).  Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe 'an offense' had been committed."  United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001) (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)).  Probable cause requires a probability of criminal activity; it does not require a prima facie showing of criminal activity.  Wilder v. Turner, 490 F.3d 810, 813–14 (10th Cir. 2007) (citing Illinois v. Gates, 462 U.S.

27

213, 243 n.13 (1983)).  Probable cause rests on a reasonable probability that a crime has been committed, not on certainty.  United States v. Gordon, 173 F.3d 761 (10th Cir. 1999). Though it is true that Mr. Painter had not yet obtained anything of value, having the bank accept the check as valid is a necessary step to obtaining funds.  Officers could reasonably believe that Mr. Painter was taking this step as a predicate to cashing the check and thus was in the process of committing an offense, or attempting to commit an offense, when he was apprehended.

Mr. Painter asserts, correctly, that the intent to deceive is the critical element that distinguishes victims from perpetrators, and points to facts that he argues tend to show that he did not have the requisite intent to defraud.[11]  These include evidence that Mr. Painter had obtained the check from someone else, information that Mr. Painter waited in Ms. Garcia's office for about 15 minutes, that he provided his drivers license to Ms. Garcia, and that neither Ms. Garcia nor Ms. Yake ever gave Officer Kelly any indication that Mr. Painter knew the check was fraudulent.  He also argues that his statements to Officers Kelly and Porlas were consistent with him being the innocent victim, not the perpetrator, that the officers were aware that his drivers license was valid, and that he had no warrants.  He further asserts that neither the check nor the envelope bore any obvious indication of fraud, which means it would have appeared valid to Mr. Painter.

---

[11]Mr. Painter points to testimony to the effect that Officer Kelly seemed unaware that the criminal offense of fraud includes an intent element.  [doc. 64-8 at 11.]  Although the Court agrees that the testimony is surprising, it has no bearing on the analysis.  The officer's subjective understanding is irrelevant; probable cause is an objective inquiry.  Buck v. City of Albuquerque, 549 F.3d 1269, 1281 (10th Cir. 2008).

While none of these factors establishes an intent to defraud, neither do they exonerate Mr. Painter.  At best, they demonstrate that Mr. Painter did not have an apparent criminal history, and arguably, that he received the check from someone else.  They do not establish that he was unaware that the check was fraudulent, and on balance are outweighed for purposes of a probable cause determination, by the fact that he was in possession of an undisputedly fraudulent instrument, on which he was the named payee, and that he had taken steps to obtain value from it from the bank.

**b.**     **Was the investigation prior to the Formal Arrest adequate?**

Mr. Painter also argues that Officers Kelly and Porlas failed to conduct a reasonable investigation into easily accessible evidence that would have proven Mr. Painter's innocence. According to Mr. Painter, they "refused to investigate basic evidence that would have confirmed that Mr. Painter was the innocent victim, not the perpetrator."  [Doc. 64 at 24.] The evidence Mr. Painter refers to are the email messages from the alleged buyer of the vehicle which, according to Mr. Painter, would have confirmed that he was the victim a scam and that he had no intent to defraud the bank.  Officers could have obtained the emails either by going to Mr. Painter's house, which was only one half mile away, or accessing Mr. Painter's email account through any computer with internet access.

The Fourth Amendment only requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed.  Romero, 45 F.3d at 1476–77. The Court concludes that the investigation conducted prior to placing Mr. Painter formally under arrest was adequate.

This is not a case, as Mr. Painter suggests, where officers ignored readily available exculpatory evidence.  The officers interviewed all the witnesses at the scene, including Mr. Painter himself, and examined the physical evidence that was available at the scene.  In this case, the emails that Mr. Painter offered to show the officers fall outside the range of "basic evidence" that is "readily available" at the scene.  He did not have copies of the emails with him and, in the Court's view, the Fourth Amendment did not require the officers to go to Mr. Painter's house or to find a computer and access Mr. Painter's email account.  Though officers did not view the bank surveillance tape, Mr. Painter does not explain how the tape would have exonerated him.

An arresting officer is not required by the Constitution to "investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."  Romero, 45 F.3d at 1478 n.3 (citing Baker v. McCollan, 443 U.S. 137, 145–46 (1979)).  Officers conducted an adequate investigation before formally placing Mr. Painter under arrest, and the adequacy of the investigation is not undermined by the fact that they did not accept Mr. Painter's offer to provide the emails which he claims would have exculpated him.

Mr. Painter implies that a ruling against him on the probable cause issue is tantamount to holding that police may lawfully arrest every citizen who presents a fraudulent check when the evidence suggests that the citizen did not know the check was fraudulent.  This matter could no doubt have been handled by the police in a manner more sensitive than placing young Mr. Painter under arrest on the spot in what appeared to be somewhat of a training

exercise for newly-graduated officers, especially given the subjective belief of some of the officers that Mr. Painter was telling the truth.   Mr. Painter was not engaged in any wrongdoing, and it appears that in fact, he was attempting to follow a prudent course of conduct in verifying that the check was valid.

Because these are circumstances that any prudent, law-abiding citizen might find himself in, the facts here present a difficult and unfortunate situation.  It began with what can perhaps be characterized as a hasty and overzealous response by bank employees especially given that Mr. Painter was a customer who maintained an account there.  However, "[t]he Constitution does not guarantee that only the guilty will be arrested." Romero, 45 F.3d at 1480 (quoting Baker v. McCollan, 443 U.S. 137, 145 (1979)).  To accept Mr. Painter's argument would require the Court to raise the standard of probable cause to something akin to a preponderance of the evidence standard.  It would be inconsistent with the established law on probable cause to hold officers to the standard Mr. Painter proposes.

The Court therefore concludes that Mr. Painter has failed to meet his burden of showing that the Formal Arrest violated his Fourth Amendment rights.   Accordingly, summary judgment must be denied in this respect.  The Court also concludes that Officers Kelly and Porlas are entitled to summary judgment because the undisputed facts show there was probable cause for an arrest after they arrived at the scene and interviewed witnesses there.

The overall result of the Court's analysis of Plaintiff's Fourth Amendment claims is that Plaintiff has shown that Officer Perry violated his right to be free from unlawful arrest

31

for a period of approximately fifteen minutes starting at the time Plaintiff was first handcuffed and ending when other officers interviewed witnesses at the scene and thereby developed probable cause to support a continued detention and formal arrest. Because this result significantly changes the posture of this case for purposes of trial, the Court will vacate the current trial setting and allow the parties to submit a revised proposal for a pretrial order as well as additional briefing on the extent of Plaintiff's claims for damages concerning his brief unlawful detention at the bank.

### C.   State Law Tort Claims

The Court now turns to consider Mr. Painter's state law claims. Mr. Painter argues that he is entitled to summary judgment on Count V (false arrest and imprisonment) against Officers Perry, Kelly, and Porlas, and on his assault and battery claim (Count VI) against Officer Perry.[12]  In their briefs, the parties appear to concede that the Court's conclusions with respect to the Initial Encounter and the Formal Arrest will dictate the result with respect to these state law claims.

### 1.   False Arrest and False Imprisonment

Under New Mexico law, "false imprisonment consists of intentionally confining or

---

[12]Governmental immunity for the acts alleged here has been waived by the New Mexico Tort Claims Act, which provides that immunity does not apply to

> liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when cause by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12 (1976).

restraining another person without his consent and with knowledge that he has no lawful authority to do so." Fuerschbach v. Southwest Airlines Co., 439 F.3d 1197, 1207 (10th Cir. 2006) (quoting Romero v. Sanchez, 895 P.2d 212, 215 (N.M. 1995)) (quotation marks omitted). "False arrest or unlawful detention occurs when the 'facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate.'" Fuerschbach, 439 F.3d at 1207 (quoting Romero, 895 P.2d at 215) (brackets and quotation marks in original). Unlawful arrest or detention has "similar requirements." Romero, 895 P.2d at 215. "A common-law defense to a civil wrongful arrest or a false imprisonment suit...requires only that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances." State v. Johnson, 930 P.2d 1148, 1153–54 (N.M. 1996).

Because Officer Perry handcuffed and arrested Mr. Painter without probable cause for a brief period of time during the Initial Encounter, it follows that Mr. Painter is entitled to partial summary judgment against him as to liability for the false arrest and imprisonment during that brief period. By the same token, because the Formal Arrest was based on probable cause developed from interviewing witnesses at the scene, Officers Kelly and Porlas are entitled to summary judgment against Mr. Painter on the false arrest and false imprisonment claims arising from the Formal Arrest.

## 2. Assault and Battery

The Court further concludes that Mr. Painter is entitled to partial summary judgment as to liability on his claims for assault and battery against Officer Perry relating to the

handcuffing during the Initial Encounter.[13]  "For there to be an assault [under New Mexico law], there must have been an 'act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'"  Fuerschbach, 439 F.3d at 1208 (quoting N.M. Stat. Ann. § 30-3-1(B)) (quotation marks in original). "Battery occurs when an individual 'acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and...an offensive contact with the person of the other directly or indirectly results.'" Fuerschbach, 439 F.3d at 1208–09 (quoting State v. Ortega, 827 P.2d 152, 155 (N.M. 1992)) (quotation marks and ellipses in original).  "Any bodily contact is offensive 'if it offends a reasonable sense of personal dignity.'"  Fuerschbach, 439 F.3d at 1209 (quoting Restatement (Second) of Torts § 19).

The record demonstrates that upon encountering Mr. Painter at the exit of the bank, Officer Perry ordered him to turn around and place his hands behind his head.  Officer Perry then conducted a pat down search that included touching Mr. Painter's "external extremities," pockets, and waistband. [Doc. 64-7 at 4.] Officer Perry handcuffed Mr. Painter after conducting the pat down search.  [Id. at 5.]  The Court concludes from these undisputed facts that Mr. Painter has established the elements of assault and battery from the time the handcuffs were placed on him until the other officers finished interviewing witnesses at the

---

[13]  With respect to the assault and battery count (Count VI), the Court construes Mr. Painter's motion as extending only to the Initial Encounter.  Although the motion refers generically to "defendant officers" in the plural, his specific argument refers only to conduct of Officer Perry who "handcuffed and held him outside the bank while the other officers talked to Ms. Yake and Ms. Garcia."  [Doc. 64 at 31.]

scene and thereby developed probable cause.  See, e.g., Fuerschbach, 439 F.3d at 1209 ("The acts of 'subduing' and 'handcuffing' are undoubtedly offensive to a reasonable sense of personal dignity.") (quoting Love v. Port Clinton, 524 N.E.2d 166, 167 (Ohio 1988)).

Accordingly, Mr. Painter is entitled to partial summary judgment against Officer Perry as to liability on the assault and battery claim arising from the handcuffing during the Initial Encounter.  Insofar as Mr. Painter seeks summary judgment on any state-law claims that go beyond the handcuffing during the Initial Encounter described above, his motions are denied in part, and the Defendants' cross-motions are granted in part.

## III.   CONCLUSION

For the foregoing reasons, the parties' cross motions for partial summary judgment are granted in part and denied in part, with the result that the only issue left for trial is whether or to what extent Mr. Painter is entitled to an award of damages for the unlawful detention, false arrest and imprisonment, and assault and battery committed by Officer Perry when he handcuffed Mr. Painter and conducted a *de facto* arrest during the brief period that ended when other officers finished interviewing witnesses at the scene and thereby established probable cause to support a formal arrest and continued detention.  Because this result significantly changes the posture of the case, the Court will vacate the current trial setting, allow the parties to submit a revised proposal for a pretrial order, and direct additional briefing on Plaintiff's remaining claim for damages, as specified below.

**IT IS, THEREFORE, ORDERED** that *Plaintiff Zachary T. Painter's Motion for Summary Judgment as to Counts I, II, V, and VI* [Doc. 64] is **GRANTED IN PART** and

35

**DENIED IN PART** under the conditions specified above.

**IT IS FURTHER ORDERED** that the *City Defendants' Motion for Summary Judgment* [Doc. 69] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**IT IS FURTHER ORDERED** that the **CALL OF THE CALENDAR** set for THURSDAY, April 9, 2009, at 9:00 a.m. and the **JURY SELECTION/TRIAL** set for MONDAY, April 13, 2009, at 9:00 a.m. are hereby **VACATED** and will be reset at a later date.

**IT IS FURTHER ORDERED** that the parties are directed to submit a revised proposal for a pretrial order to the Court's proposed text emailbox, along with a concurrent electronic filing on the CM/ECF system of a notice of filing of proposed pretrial order, by no later than April 10, 2009.

**IT IS FURTHER ORDERED** that the parties shall submit simultaneous trial briefs addressing the legal authorities and anticipated evidence regarding their respective claims and defenses on Plaintiff's remaining claim for damages by no later than April 10, 2009. Thereafter, the Court will schedule a status conference.

**SO ORDERED** this 31st day of March 2009**,** in Albuquerque New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

36